# CIRCUIT COURT OF THE CITY OF RICHMOND

Diana Damschroder Patterson

v.

John Wallace Patterson

February 4, 1997

Case No. HE-1069-1

BY JUDGE RANDALL G. JOHNSON

This divorce action is before the court on Mr. Patterson's motion for a reduction in spousal support, which is currently set at $5,000 a month. His former wife, who is now known as Diana Damschroder, objects to a reduction.

The final decree was entered on November 22, 1995. At the time, Patterson, who is a lawyer, was an equity partner in the Richmond law firm of McGuire, Woods, Battle & Boothe, where he had worked since 1972. His monthly net income was $10,345. Several years before the divorce, however, the firm's executive committee became dissatisfied with Patterson's productivity. They communicated their concerns to Patterson, and told him that he would have to improve if he wanted to stay with the firm. While his productivity, which the firm measures for the most part in billable hours, did improve for a while, it again became less than what was acceptable to the firm. In December, 1995, Patterson was given a one-year terminal contract to end on December 31, 1996, with certain financial incentives if he left earlier. He did not leave earlier, and his last day working at McGuire, Woods was December 31, 1996. He has been unemployed since then, but plans to open a franchise cigar store in Savannah, Georgia, in March or April, 1997. He estimates his monthly salary to be $3,000 from the store.

Damschroder objects to the request for a reduction for two reasons. First, she argues that Patterson's leaving McGuire, Woods was his fault, that is, that he had the ability to produce at the level expected of him by the firm, but that he chose not to make the effort. Second, Damschroder contends that Patterson's efforts to find new employment were not sufficient to warrant a reduction in support. In either case, says Damschroder, Patterson is now voluntarily unemployed and will be voluntarily underemployed even after he opens the cigar store. The question presented is not easy to answer.

It is the law in Virginia that a person who is voluntarily unemployed or underemployed is not relieved of his or her support obligation. Va. Code § 20-108.1(B)(3). In such situations, income will be imputed to the obligor. *Id.* What is not so clear is exactly what constitutes *voluntary* unemployment or underemployment, particularly where a person is fired or forced to resign because of nonperformance. In fact, the court has found no supporting case directly on point. In the area of unemployment compensation, Va. Code § 60-2-618(2) provides that an individual is disqualified for unemployment benefits if he or she "has been discharged for misconduct connected with his [or her] work." In that regard, our Supreme Court has said:

> In our view, an employee is guilty of "misconduct connected with his work" when he *deliberately* violates a company rule reasonably designed to protect the legitimate business interests of his employer, or when his acts or omissions are of such a nature or so recurrent as to manifest a *willful* disregard of those interests and the duties and obligations he owes his employer.

*Branch v. Employment Commission,* 219 Va. 609, 611, 249 S.E.2d 180 (1978) (emphasis in original).

In *Whitt v. Ervin B. Davis & Co.,* 20 Va. App. 432, 457 S.E.2d 779 (1995), the Court of Appeals held:

> [U]nder *Branch,* when an employee is discharged for poor performance, he or she is entitled to unemployment compensation unless the employer shows that the conduct resulting in the employee's discharge constituted acts or omissions of such a nature or so recurrent as to manifest willful disregard for the employer's interests ... . Moreover, the record must establish that an employee's poor performance did not result merely from inexperience or an inability to perform the task assigned.

20 Va. App. at 437 (citation to *Branch, supra*, omitted). *See also Borbas v. Virginia Employment Commission*, 17 Va. App. 720, 440 S.E.2d 630 (1994).

While the above cases, and other unemployment compensation cases like them, are helpful, there are at least two significant differences between them and cases like the one at bar. First, while the burden of proving the employee's misconduct in an unemployment compensation case rests with the employer, it is the support obligor's burden to show a *lack* of misconduct when seeking to have a support obligation reduced. *See, e.g., Antonelli v. Antonelli*, 242 Va. 152, 409 S.E.2d 117 (1991) ("[A] party seeking a change in court-ordered ... support has the burden to prove by a preponderance of the evidence a material change in circumstances justifying modification of the support requirement"). Second, while an adverse unemployment compensation decision affects only the applicant for it, the court's decision here affects another person already determined by the court to be in need of support. To paraphrase *Antonelli*, when a former husband who is under court order to pay a certain sum for spousal support, which he was able to pay given his employment, chooses to risk being fired because of poor performance, the risk of his actions is upon the former husband, and not upon the obligee-former wife. Consequently, a support obligor would seem to have a heavier burden to show a lack of misconduct than an employer has to show the existence of misconduct. In either event, it is still up to the court to determine whether misconduct exists, and that can only be done by looking at the particular facts of each case.

In making their arguments in this case, each party can point to evidence in the record to support his or her position. For example, Patterson testified that he represented large, institutional clients, and that his level of productivity depended on what his clients needed. According to him, he never turned down work. On the other hand, Damschroder called as a witness John Bates, McGuire, Woods' managing partner from 1989 until March, 1996, who testified that Patterson could have satisfied the billable hours requirement "if he tried." Damschroder also points out that Patterson's termination from the firm occurred while he was engaged in the same romantic affair that led to the parties' separation and divorce, suggesting that Patterson's troubles at work, like his troubles at home, were tied to the affair. The testimony of John Bates and William Strickland, however, Strickland being the current managing partner of McGuire, Woods and a former member of the executive committee, was that Patterson's productivity problems began as early as 1989. Patterson's affair, according to the divorce record, began in 1993. While Bates and Strickland testified that Patterson was repeatedly warned about his unsatisfactory performance, Patterson said there was only one meeting and that he was never given a chance to improve. In sum, there is evidence in the

record from which the court, as fact finder, can find that Patterson's termination from the firm was for misconduct, and there is evidence from which the court can find that the termination was not for misconduct. The court finds that the termination was not for misconduct.

The most damaging piece of evidence against Patterson was the testimony of John Bates that Patterson could have produced the necessary number of billable hours, about 1,600 a year, if he tried. While that testimony is significant, it raises several questions. For example, since there was no testimony that any of Patterson's clients were not properly represented or otherwise serviced by Patterson — in fact, the testimony was that they were very satisfied with him — what was Patterson supposed to do to add more hours? If Damschroder (and Bates) are suggesting that Patterson should have made up work to "milk" his clients for more money, the court certainly will not ratify that argument by penalizing Patterson for not doing so. Was Patterson supposed to "steal" work from his partners and associates to fulfill his billable hour requirement at their expense? Again, the court will not condone such a tactic by holding that Patterson's refusal to do so was misconduct. Was Patterson supposed to be a "rainmaker" and bring more clients to the firm? Perhaps so, but he had never been a rainmaker before and there was no testimony about any potential clients Patterson could have brought, but did not bring, to the firm. While Paterson's termination was unfortunate, it is not something that is unheard of in the legal community. It does not constitute misconduct.

Turning now to Damschroder's second argument, that Patterson's efforts to find new employment were lacking, the evidence again is in dispute. Patterson testified that he signed on with an "outplacement firm" in early 1995 which sought jobs throughout the country. He also applied for over thirty jobs on his own. Indeed, the documents which he introduced into evidence at the hearing leave no doubt that his nationwide search for a job was commendable. The court is not convinced, however, that Patterson's overall effort to find employment was sufficient, and this is because of his lack of effort at home.

When Patterson graduated from law school in 1972, he and Damschroder moved to Richmond where Patterson became an associate with McGuire, Woods. He became a partner eight years later, and has been here since. Upon being terminated by McGuire, Woods, however, Patterson made absolutely no effort to become employed by, or taken on as a partner with, any other Richmond or Richmond-area law firm. In fact, his only attempt to obtain employment in Richmond, where he and his experience are presumably best-known, was with two of his clients at McGuire, Woods, Heilig-Meyers Furniture Company and Universal Leaf Tobacco Company, as in-house

counsel. Both efforts were unsuccessful. While Patterson claims that his failure to search for jobs with Richmond-area law firms resulted from his "certainty" that a person of his age and experience would not be hired or taken on as a partner at any Richmond firm, the court rejects that argument. Rather, the court is inclined to agree with Damschroder's suggestion that Patterson's real goal in his job search was to move closer to his lover, who lives in Beaufort, South Carolina. In fact, Savannah, Georgia, where his cigar store will be located, is only a one-hour drive from Beaufort. While Patterson claims that this is only a coincidence, the court is not so sure. In any event, the party seeking a change in support has the burden of showing that reasonable efforts were taken to avoid an adverse change in circumstances. By not even applying for a job or partnership with any Richmond or Richmond-area law firms, Patterson lost his chance to carry that burden. Accordingly, the court finds that his job search was not sufficient to avoid an imputation of income to him. That imputation of income, however, will not be at the level of his income at McGuire, Woods.

As previously noted, Patterson's net monthly income at McGuire, Woods was $10,345. Considering the nature of plaintiff's experience and the fact that he was not a rainmaker, it is not realistic to assume that he could have moved to another firm at the same level of pay. The court does believe that some Richmond firm would have paid Patterson at least half of what he was making in order to get his experience and the possibility of at least some of his "very satisfied" clients moving with him. While the court cannot know this to be a fact, it is Patterson who failed to carry his burden to show that it is *not* a fact. By the same token, Damschroder presented no evidence to show a potentially higher salary. The court will impute net monthly income to Patterson of $5,172, one-half of his income at McGuire, Woods.

Moving finally to the question of amount of support, the court has considered the parties' statements of expenses and has compared them with the statements submitted in 1995. Patterson's statement is about the same; that is, his monthly expenses are about $3,600, the amount of projected expenses at the time of the divorce. Damschroder's claimed expenses are about $9,000, compared to about $8,000 in 1995. As they were in 1995, they are a little overstated. Nevertheless, the court again finds that neither parties' claimed expenses are outrageous. In light of Patterson's loss of employment, however, both of them will have to make do with less. The court will modify the previous support award by requiring Patterson to pay support to Damschroder in the amount of $2,000 a month, effective January 1, 1997.